No. 53,311

THOMAS F. COSGROVE and MARY C. VAN SLYCK, *Appellees and Cross-Appellants,* v. LOUISE B. YOUNG, DONALD P. YOUNG, JR., and FREDERIC R. YOUNG, *Appellants.*

(642 P.2d 75)

Opinion filed February 27, 1981.

*B. G. Larson,* of Williams, Larson, Voss, Strobel and Estes, of Dodge City, argued the cause, and *George Voss,* of the same firm, was on the brief for appellants.

*Gene H. Sharp,* of Vance, Hobble, Neubauer, Nordling, Sharp and McQueen, P.A., argued the cause and was on the brief for appellees and cross-appellants.

The opinion of the court was delivered by

McFARLAND, J.: Plaintiffs Thomas F. Cosgrove and Mary C. Van Slyck brought this action against defendants Louise B. Young, Donald P. Young, Jr., and Frederic R. Young: (1) To declare that a certain instrument conveying a royalty interest in gas and oil production was void for violation of the rule against perpetuities; and (2) to quiet plaintiffs' title to said property. On stipulated facts, the trial court held the instrument was a nullity but permitted defendants to continue to receive royalties from one 1950 unitized off-premises gas well. There were three wells on the subject tract in which defendants were barred from participation. The parties appeal and cross-appeal from those portions of the judgment adverse to their respective interests.

It is appropriate at this point to summarize the issues and place them in a logical sequence. The first question is whether the instrument before us conveyed a royalty interest or a mineral interest. If it is determined that a royalty interest was conveyed, then we are asked to determine whether a subsequent unitization agreement modified the original instrument into a conveyance of a mineral interest. If we conclude no such modification occurred, then we are asked to determine whether the conveyance violates the rule against perpetuities. If the conveyance is void, we must then consider the propriety of the trial court's judgment permitting defendants to continue to receive royalties from the one well by application of equitable principles and through adverse possession.

We turn now to the first issue which is whether the instrument conveyed a royalty interest or a mineral interest.

Plaintiffs argue that the instrument merely conveyed a royalty interest.

Defendants contend that the instrument created a right to minerals in place rather than a royalty interest.

In determining the type of interest conveyed, we are not governed by the title affixed to the conveying document, but will look instead to the language of the contract contained in its four corners and from there find the intention of the parties. *Froelich v. United Royalty Co.,* 178 Kan. 503, 290 P.2d 93 (1955).

It should be borne in mind that plaintiffs are the successors in interest to Mr. and Mrs. Akers, grantors under the instrument,

while defendants are the successors in interest to Stewart, the grantee.

The instrument involved herein provides as follows:

"CONTRACT ON GAS AND OIL ROYALTY

"THIS CONTRACT made and entered into this 11th day of January, 1918, by and between U. S. Akers and Nellie G. Akers, his wife, of Prowers County, in the State of Colorado, parties of the first part and A. G. Stewart, of Seward County, in the State of Kansas, as party of the second part,

"WITNESSETH: That said parties of the first part, in consideration of the sum of $50.00, the receipt of which is hereby acknowledged, do by these presents sell, assign and agree to deliver unto said party of the second part, his heirs and assigns, one-half (½) the royalty in Oil and Gas produced upon the following described land to-wit:

The East Half of Section twenty-two (22), in Township thirty-three (33), Range thirty-four (34), in Seward County, Kansas, containing 320 acres, more or less, according to the Government survey thereof;

and that this contract conveys to the second party, said royalty, whether paid in cash by the company now holding the oil and gas lease on said premises, as provided in such lease, or of any royalties to become due and owing by reason of any future oil or gas leases executed and delivered by the said first parties or their assigns; and that this contract further binds said first parties, their heirs or assigns, to deliver to the second party one-half of all royalties to become due and owing to said first parties, their heirs or assigns by reason of any production of oil or gas produced upon said premises.

"The said first parties hereby bind themselves, their heirs and assigns, unto said second party, to promptly deliver to said second party his one-half of said royalties immediately upon receipt of said royalty by the said first parties, in the event said royalties are paid to said first parties, and the present lessee, and the lessees of any future leases upon said premises are hereby authorized and directed to pay direct to said second party, his one-half of any and all royalties becoming due first parties by virtue of any oil or gas lease.

"Said first parties hereby waive any and all right to the said one-half of said royalty herein conveyed, and hereby firmly bind themselves, their heirs, executors, trustees and assigns, by these presents.

"IN WITNESS WHEREOF the said parties of the first part have hereunto set their hands this 16th day of January, 1918.

/s/U. S. Akers
/s/Nellie G. Akers"

In holding that the instrument herein is a conveyance of royalty interests only and not a conveyance of minerals in place, the trial court cited as controlling the case of *Lathrop v. Eyestone,* 170 Kan. 419, 227 P.2d 136 (1951).

*Lathrop* was a quiet title action in which the court was required to interpret three instruments. In so doing, the court set out several well-established principles:

"As we have frequently stated the term 'royalty' is often rather loosely and inaccurately used by men in the petroleum industry, those dealing in oil and gas holdings and at times by attorneys. Some persons refer to oil and gas in place as royalty. Others refer to royalty as the landowner's share in production. We have, therefore, repeatedly held the true nature and character of the instrument is not to be determined by the name or label attached thereto but by its intent as reflected by the terms, the contents thereof. A few of such cases are *Serena v. Rubin,* 146 Kan. 603, 72 P.2d 995; *Fry v. Dewees,* 151 Kan. 488, 99 P.2d 844; *Rutland Savings Bank v. Steele,* 155 Kan. 667, 127 P.2d 471; *Dennett v. Meredith,* 168 Kan. 58, 64, 211 P.2d 117. See, also, annotation in 4 A.L.R. 2d 492, 496.

"A mineral deed is one which makes a severance, from the fee, of a present title to minerals in place. It is actually a realty conveyance. (*Richards v. Shearer,* 145 Kan. 88, 64 P.2d 56; *Rathbun v. Williams,* 154 Kan. 601, 121 P.2d 243; *Hickey v. Dirks,* 156 Kan. 326, 327, 133 P.2d 107.) On the other hand 'royalty' in its ordinary meaning is that part of oil and gas payable to the lessor by the lessee out of oil and gas actually produced and saved. It is the compensation to the lessor provided in the lease for the lessee's privilege of drilling and producing oil or gas. It does not include a perpetual interest in and to the oil and gas in place. (*Bellport v. Harrison,* 123 Kan. 310, 255 Pac. 52; *Burden v. Gypsy Oil Co.,* 141 Kan. 147, 40 P.2d 463; *Rutland Savings Bank v. Steele, supra; Rathbun v. Williams, supra.*) It is not uncommon to find 'royalty' shortly defined as 'a share' in production 'paid.' (Anno. 4 A.L.R.2d 492, 497.) It is personal property. (*Hickey v. Dirks, supra,* and cases therein cited.) The lessee's interest in the oil produced, commonly seven-eighths or whatever the lease provides, is called the working interest. (*Robinson v. Jones,* 119 Kan. 609, 240 Pac. 957; *Davis v. Hurst,* 150 Kan. 130, 90 Pac. 2d 1100.)

"In the *Bellport case, supra,* it was held:

'The ordinary meaning of the word 'royalty' in an existing oil and gas lease cannot be enlarged by proof of usage and custom so as to include a conveyance of oil and gas in place in the land and the perpetual right to go upon the premises to explore for and produce oil and gas.' (Syl. ¶ 2.)

"The cardinal principle or test to be applied in the interpretation of such instruments, as in others, is the intention of the parties. (*Rutland Savings Bank v. Steele, supra.*) Although all parts of the instrument are to be considered the granting clause is, of course, paramount in determining what interest was intended to be granted. (*Hickey v. Dirks, supra,* p. 330)" 170 Kan. at 423-424.

The first instrument in *Lathrop* contained the language: ". . . we . . . do sell, assign and deliver . . . an undivided one-fourth (¼) interest in and to all the oil and gas right, title and claim, we now own . . . including all of the oil and gas, rent and royalties . . . also a perpetual and irrevocable right . . . to enter upon said land . . . and prospect for and drill wells for oil and gas therein . . . ." 170 Kan. at 421. The court found that the grantors intended to convey an undivided one-fourth interest of the oil and gas in place to the grantee and, thus, conveyed an interest in the land. 170 Kan. at 425.

Of the second instrument, the court said:

"This brings us to the second instrument set forth. Here the interest conveyed is '. . . an undivided one-fourth (¼) in a certain oil and gas mining lease. . . .' Under the mining lease referred to the grantee, Stanley, was entitled to one fourth of the oil and gas 'royalties reserved to the lessors.' That meant the grantors conveyed one fourth of one fourth or one sixteenth of the oil and gas produced. This was an interest in personal property and not title to oil and gas in place." 170 Kan. at 425.

The third instrument was similar in pertinent terms to the second, and the court found that it too, conveyed only an interest in personal property.

In other cases, this court has been required to determine whether a grant in conveyance was of minerals in place or of a royalty interest. In *Froelich,* the court found an instrument entitled "Royalty Conveyance" to be a grant of minerals in place rather than a royalty interest. The instrument under consideration in *Froelich* contained the following language:

" '. . . party of the first part [consideration] does hereby bargain, sell . . . to second party . . . an undivided one half . . . interest in and to the oil and gas royalty, which is or may hereafter be reserved by said party of the first part . . . exclusive of the oil and gas bonus and oil and gas rental money in and under the following described property [description].

" 'To have and to hold, all the aforegranted estate, property, and easements together with all and singular the rights, privileges and hereditaments thereunder belonging or appertaining unto the said United Royalty Company, an express trust of Newkirk, Oklahoma, its heirs, successors, for a term of twenty-one years and as long thereafter as oil and gas or either of them is produced in paying quantities on any of the acreages in the block belonging to the United Royalty Company.

" 'It is understood and agreed that said first party shall be entitled to have and receive all oil and gas bonuses and rentals from said land other than royalty herein above described. That in the leasing of said land for oil and gas that the said second party shall not be a necessary party to the leasing of said land and the said second party hereby authorizes the said party of the first part . . . to lease said land for oil and gas purposes.

. . . .

" 'It is understood and agreed that this royalty is not transferable but shall be held in trust by the United Royalty Company, an express trust of Newkirk, Oklahoma. . . .' " 178 Kan. at 506.

In interpreting this language, the court set out the following general principles:

"It is true that the instrument is headed 'Royalty Conveyance' but we are not governed by the name or title affixed to a document. This court has many times said that we will look to the language of a contract contained in its four corners and from there find the intention of the parties as to what kind of a contract they

intended to make. (*Rutland Savings Bank v. Steele*, 155 Kan. 667, 127 P.2d 471; *Heckard v. Park*, 164 Kan. 216, 188 P.2d 926; *Dennett v. Meredith*, 168 Kan. 58, 211 P.2d 117; 17 C.J.S., Contracts, § 295, p. 689, § 296, p. 695; 24 Am. Jur., Gas and Oil, § 22, p. 533.)

"There is merit in what appellees contend that royalty, royalty deed, royalty conveyance, and mineral deed are terms that have been loosely and interchangeably used by the oil and gas industry and even by some courts. However, the majority of courts have been very careful to guard against confusing these terms. There is a definite difference between minerals in place and minerals severed and produced from the land. Minerals, including oil and gas, in place or in and under the land are termed as realty, are part of the land or fee, or real estate, and a transfer of interests in this type of minerals is held to be a severance of the fee. In other words, one person may own the surface of the land while another person may own the minerals under the surface. On the other hand, royalty in oil and gas severed and produced from the land under an oil and gas lease is merely personal property and does not create any interest in the minerals under the land or cause a severance of the fee." 178 Kan. at 506-507.

In concluding that the interest conveyed minerals in place rather than a royalty interest, the court stated at 508:

"Had the royalty conveyance stopped after it stated, in short, that United was to receive one half of Butlers' oil and gas royalty . . . reserved . . . exclusive of . . . bonus . . . rental money in and under the described property, it might be considered as conveying only a naked royalty. However, the royalty conveyance continues to show United to be a trust of Newkirk, Oklahoma; the tenure of the instrument to be twenty-one years, or as long as there is production on any of the acreages in the block belonging to United; the waiver on the part of United to be a party to the leasing of the land authorizing the Butlers, or their assignees to lease for oil and gas; and finally, that the interest held in trust by United cannot be transferred."

Another case which involved the interpretation of an instrument to determine whether minerals in place or a royalty interest were conveyed is *Magnusson v. Colorado Oil and Gas Corp.*, 183 Kan. 568, 331 P.2d 577 (1958). The instrument in *Magnusson* was entitled "Royalty Deed." It conveyed an undivided one-half of the royalty, an undivided one-sixteenth interest in and to the oil lying under the land, and one-half of the first parties' interest in any gas lying under the land.

After setting out general rules of construction, the court stated at 573:

"However, notwithstanding these rather conclusive statements, it is likewise the rule that where the title of the instrument is similar to the one here under consideration, 'Royalty Deed,' the contents of the instrument must make it clear that it is something else than what its title indicates (*Skelly Oil Co. v. Cities Service Oil Co.*, [160 Kan. 226, 230, 160 P.2d 246 (1945).] p. 230)."

The court concluded at 575:

"Generally speaking, a grant and conveyance of minerals in place which also includes an assignment of a corresponding royalty interest does not in any way limit the property conveyed to that of a mere royalty."

In *Shepard, Executrix v. John Hancock Mutual Life Ins. Co.,* 189 Kan. 125, 368 P.2d 19 (1962), the court had to determine the nature of the interest reserved by the following language contained in a deed:

" '[E]xcepting and reserving with right of ingress and egress, an undivided ¼ of the landowners ⅛ royalty, or, 1/32 of the interest in and to all oil, gas or other minerals (of every character and kind) in or under the said land for a period of fifteen (15) years from April 1, 1940 and as long thereafter as oil, gas or any other mineral, is produced from said land, or operations for any such mineral are being conducted thereon by grantees or grantor (their Successors or assigns). The said royalty reservation shall not be participating in bonuses or rentals, but shall be participating in other rights, royalties and other benefits accruing under any existing or future oil, gas or mineral lease while the said royalty reservation is in full force and effect.' " 189 Kan. at 127.

In finding that this language conveyed an interest in minerals in place, rather than a mere royalty interest, the court made the following analysis:

"For purposes of analyzing the reservation, we divide it into its two parts—its two sentences. The first part contains two related clauses while the second part has only one, and the terms 'royalty' and 'royalty reservation,' respectively, are used in each. The use of those terms, together with the fractional discrepancy in describing the interest reserved, appear consistent with and lend support to plaintiff's claim that the instrument created a royalty interest, that is, ¼th of ⅛th royalty is the same as 1/32nd of the production. But the consistency is only apparent. It vanishes in face of the fact that the reservation does not make reference to a 1/32nd share of production as urged by the plaintiffs. The first clause of the first part of the reservation recites that the defendant excepts and reserves 'an undivided ¼ of the landowners ⅛ royalty.' Standing alone, that would appear to reserve a true royalty interest, but the clause is prefaced by the words 'with right of ingress and egress.' That language is significant. (*Gas Co. v. Oil Co.,* 83 Kan. 136, 141, 109 Pac. 1002.) It gave the defendant the right to use the surface of plaintiffs' land so far as might be necessary for it to avail itself of the use and benefit of the interest reserved. An assignment or reservation of a royalty interest does not carry the right to explore for and remove the minerals in place, and the right of ingress and egress would not be necessary if all that was reserved was merely a right to share in production from the land as distinguished from the right to develop the same for the production of the minerals reserved.

"The second clause of the first part commences with the function word 'or' to describe with greater exactness of phrasing and meaning the first clause, and states '1/32 of the interest in and to all oil, gas or other minerals (of every character

and kind) in and under the said land for a period of fifteen (15) years from April 1, 1940 and as long thereafter as oil, gas or any other mineral, is produced from said land. . . .' The language, 'in and to all oil, gas and other minerals (of every character and kind) in and under the said land' is diametrically opposed to the definition of royalty, and to deny its apparent meaning as an estate in land and interpret it to mean 'a share of production' only, as the plaintiffs suggest, would be irregular and clearly unwarranted. The language is very similar to deeds of conveyance previously reviewed by this court and held to convey present title to minerals in place (*Magnussón v. Colorado Oil & Gas Corp., supra*, p. 574), and it is persuasive evidence that minerals in place were reserved. Likewise, the remaining portion of the second clause, 'or operations for any such mineral are being conducted thereon by grantees or grantor (their Successors or assigns),' tends to confirm that conclusion. Unless that language is meaningless, it constitutes further evidence that the defendant reserved minerals in place with the right of either party or their successors or assigns, upon the expiration of the Jennings leases, to conduct operations for the production of the minerals, jointly or individually, and if conducted by the defendant individually, the 'right of ingress and egress' reserved in the first clause afforded it a means to enter upon the property for that purpose. As previously noted, a royalty interest does not carry the right to explore for and remove the minerals in place, and the right to conduct operations upon the land would be a useless right if all that was reserved was only royalty or a share of the proceeds of the production from the land." 189 Kan. at 131-132.

Although the court's analysis continues, the portion set out above is sufficient to show the court's reasoning.

Finally in *Corbin v. Moser*, 195 Kan. 252, Syl. ¶ 3, 403 P.2d 800 (1965), the court held the following:

"The language in a deed conveying a quarter section of land which reads: 'except a one Sixteenth (1/16) Royalty interest of all oil, gas or minerals in place . . . which oil, gas and minerals is reserved to grantors; . . .' is construed to reserve a one-half royalty interest to the grantor and not a mineral interest."

In light of these cases, it must now be determined whether the conveyance involved herein was of a royalty interest or of minerals in place.

The granting clause in the "Contract on Gas and Oil Royalty" states that the parties of the first part "sell, assign and agree to deliver . . . one-half (½) of the royalty in Oil and Gas produced upon the . . . land . . . ." No right of ingress and egress is granted. No reference is made to oil, gas and other minerals in and under the land. In short, no further reservations were made in the contract relating to transferability, leasing rights, or other factors previously considered significant by the

court. See *Froelich,* 178 Kan. 503; *Shepard,* 189 Kan. 125. There is nothing in the instrument indicating that more than a bare royalty interest was intended to be conveyed.

We conclude the trial court correctly applied existing Kansas law in holding that the interest conveyed was a royalty interest and not an interest in minerals in place.

Having concluded that the original instrument conveyed only a royalty interest, we are asked to determine whether a subsequent unitization agreement modified the original instrument into a conveyance of a mineral interest.

In 1949 a gas unitization agreement was entered into, which was signed by M. F. Cosgrove (plaintiffs' predecessor in interest) and J. L. Tice (defendants' predecessor in interest), along with some twenty-five other individuals. The unitization agreement covered all of Section 22, Township 33 South, Range 34 West, containing 640 acres. A gas well, Etzold #1, was drilled in 1949 in the Southwest Quarter of Section 22-33S-34W, and began producing in 1950.

The agreement states the Cosgrove interest consists of "surface rights and mineral rights subject to a certain Contract for Gas and Oil Royalty dated January 6, 1918 . . . ." Defendants contend that the execution of the gas unitization agreement by plaintiffs' predecessors in interest modified the original 1918 instrument into a conveyance of a mineral interest. No authority for this proposition has been provided, nor has our research unearthed any.

We conclude that the 1918 instrument conveyed only a royalty interest and the execution in 1949 of a gas unitization agreement in no way altered the type of interest conveyed.

The next determination is whether the conveyance violates the rule against perpetuities.

The rule is set out in 61 Am. Jur. 2d, Perpetuities, Etc. § 6 at 12-13 as follows:

"The orthodox rule against perpetuities prohibits the creation of future interests or estates which by possibility may not become vested within a life or lives in being at the time of the testator's death or the effective date of the instrument creating the future interest, and 21 years thereafter, together with the period of gestation when the inclusion of the latter is necessary to cover cases of posthumous birth.

"Stated affirmatively, the rule against perpetuities allows the postponement of the vesting of an estate or interest for the period of lives in being and 21 years and

the period of gestation. Hence, under this rule, no interest subject to a condition precedent is good unless the condition must be fulfilled, if at all, within 21 years and the period of gestation after some life in being at the creation of the interest. Any limitation of a future interest which violates this rule is void. But insofar as the rule against perpetuities is concerned, if the limitation over must take effect at all events within a life or lives in being and 21 years, it is valid.

"The rule's usual application and effect is to prohibit or invalidate attempts to create by limitation, whether executory or by way of remainder, future interests or estates the vesting of which is postponed beyond the prescribed period."

The third instrument involved in *Lathrop* contained provisions which purported to grant an interest in royalties, rents and bonuses on other oil and gas leases which might be executed *in the future.* Of these provisions, the court stated:

"Appellant or future fee owners might never execute another lease. There is nothing in any of the instruments which imposes a duty on them to do so. Under the last two instruments, at least, the fee title owner would not be precluded from doing his own developing. (*Miller v. Sooy,* [120 Kan. 81, 242 Pac. 140 (1926)]; *Leydig v. Commissioner of Internal Revenue,* 43 F.2d 494, 496.) Moreover there is no limitation of time within which a future lease would be required to be executed, if one were actually executed. It is, therefore, wholly problematical when, if ever, such an interest under future leases would vest. Such a grant violates the rule against perpetuities, a rule against too remote vesting. In 41 Am. Jur., Perpetuities and Restraints on Alienation, § 24, it is said:

" 'One of the essential elements of the rule against perpetuities is that at the time the future interest is created, it must appear that the condition precedent to vesting must necessarily happen, if it happens at all, within the period prescribed by the rule . . . . A possibility, or even a probability, that the interest or estate may vest within that time is not enough, for, it is said, the question of probabilities does not enter into the equation. If by any conceivable combination of circumstances it is possible that the event upon which the estate or interest is limited may not occur within the period of the rule, or if there is left any room for uncertainty or doubt on the point, the limitation is void.'

"The foregoing statement constitutes the well recognized rule which is in harmony with our own decisions. (*Klingman v. Gilbert,* 90 Kan. 545, 548, 135 Pac. 682; *Malmquist v. Detar,* 123 Kan. 384, 255 Pac. 42; *Beverlin v. First National Bank,* 151 Kan. 307, 98 P.2d 200; *McEwen v. Enoch,* 167 Kan. 119, 204 P.2d 736.)" 170 Kan. at 428-429.

When there is a possibility that vesting may occur beyond the time limit, the rule is violated. See *In re Estate of Foster,* 190 Kan. 498, 501, 376 P.2d 784 (1962).

In the instrument before us, the intention of the grantors to make the conveyance applicable to future oil and gas leases, as well as to the lease covering the property at the time the conveyance was executed, is demonstrated by the language used, to-wit:

"[T]his contract conveys to the second party, said royalty, whether paid in cash by the company now holding the oil and gas lease on said premises, as provided in such lease, or of any royalties to become due and owing by reason of any future oil or gas leases executed and delivered by the said first parties or their assigns;"

and by the following language:

"[T]he lessees of any future leases upon the premises are hereby authorized and directed to pay direct to said second party, his one-half of any and all royalties becoming due first parties by virtue of any oil or gas lease."

As was the situation in *Lathrop v. Eyestone,* the instrument does not require the grantor or his successors to execute and deliver any future oil and gas leases at any future time. Naturally, if no future oil and gas leases are made and executed, there would never be a vesting of title to any royalty interest. If it is not certain the vesting will occur within the time stated in the rule, then the rule has been violated and the conveyance is void. Even if an oil and gas lease were required to be executed within the time prescribed by law, there would still be no vesting of title until royalty becomes due and payable to the grantor or his successor. The execution and delivery of an oil and gas lease does not insure that there will ever be any production attributable to the lease. Additionally, as was the situation in *Lathrop v. Eyestone,* the instrument is not prohibitive of the grantor developing the minerals for himself, without any oil and gas lease being involved. Under such circumstances, there would never be any royalties paid to anyone.

We note also that over thirty-one years elapsed between the execution of the conveyance and the time production was obtained with resultant royalties payable. Unlike the majority of cases involving the rule against perpetuities wherein courts must speculate as to the possible happening of future events, in this case all pertinent events have already occurred.

We conclude the trial court correctly held that the instrument was in violation of the rule against perpetuities and, hence, null and void. We are not unmindful that some other jurisdictions might well reach a different result in applying their case law to the issue herein. However, the parties hereto seek no alteration of our existing case law and we see no compelling reason for change.

This brings us down to the next issue which, stated in general terms, is whether the trial court properly utilized equitable principles to modify the legal result it had reached herein.

Specifically, plaintiffs contend that the trial court erred in permitting defendants to continue to receive royalties on the one well based on equitable principles. Defendants contend the trial court erred in failing to apply those equitable principles across-the-board and thereby allow them to receive royalties from all production now or in the future from said tract.

Inasmuch as this came before the trial court on an agreed stipulation of facts and documentary evidence, this court is afforded the same opportunity to consider the evidence as the trial court in *Stith v. Williams,* 227 Kan. 32, Syl. ¶ 1, 605 P.2d 86 (1980).

Some background facts need to be set forth. At the time of the execution of the conveyance herein there was an oil and gas lease on the subject property. No production occurred under said lease and it was judicially cancelled in 1922. The property was again leased for gas and oil development in 1944. In 1949, as previously mentioned, a gas unitization agreement was executed by 27 individuals including the parties' predecessors in title. An off-premises unitized gas well commenced production in 1950 and is producing from the Hugoton pay zone.

In August of 1978, an oil well was completed on the subject property. Since then a gas well and another oil well have commenced production thereon. All three of these wells are producing from below the Hugoton pay zone. In October 1978, plaintiffs refused to sign the division order for the August 1978 well contending this is the first time they knew of defendants' royalty interest. No royalties have been paid to defendants since that date.

Defendants argue that their royalty interest has, by virtue of the passage of time and the happening of the various events, ripened into a mineral interest. No authority has been cited nor located for the proposition that a personal property interest can ever ripen or mutate into a real property interest.

In the recent case of *Stratmann v. Stratmann,* 6 Kan. App. 2d 403, 628 P.2d 1080 (1981), the Kansas Court of Appeals addressed issues of estoppel and laches in a context very similar to that presented here. The *Stratmann* case well summarized the applicable law on these equitable principles and will be set forth in considerable detail.

Marvin Stratmann executed a quitclaim deed on certain real

estate without reserving a royalty interest. The grantees were all Marvin's siblings. One brother told Marvin at the time that he would continue receiving his royalty checks. For fifteen years thereafter, Marvin did receive the royalty checks. The siblings then stopped the royalty checks and Marvin brought the action. The court held:

"Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts." Syl. ¶ 6.

"The doctrine of laches is an equitable device designed to bar stale claims, and courts of equity will regard long passage of time in asserting claims with disfavor, apart from any particular statute of limitations." Syl. ¶ 9.

"Where, as here, one of the grantees in a quitclaim deed promised the grantor that grantor would continue to receive royalty payments due for oil and gas recovered from the subject property, and the other grantees in the deed were advised of such promise at or about the time the deed was received, and the grantor continued to receive royalty payments without any objection by any of the grantees for over 15 years, it is *held:* Grantees are now precluded from asserting the right to any past or future royalties on the grounds of estoppel, waiver and laches." Syl. ¶ 11.

The court in *Stratmann* held estoppel to be applicable on the following rationale:

"The misrepresentation in this case was Otto's telling Marvin that the quitclaim deed would not affect his right to collect royalties when in fact it did. The misrepresentation was made in order to induce Marvin to give up the land.

"Bert and Mathilda argue there was certainly no detriment, but rather a benefit to Marvin because he was able to receive the royalty payments in the past.

"In *Fast v. Fast,* 209 Kan. 24, it was claimed that the defendants were estopped to claim title to the minerals because the grantor had continued to receive royalties and pay taxes on the interest until he died. The court held there was no misrepresentation or detrimental reliance.

"Here there was a misrepresentation and Marvin claims there was detrimental reliance because had the claim to the royalty interest been raised earlier, he could have brought suit for fraud and cancelled the transfer. Now the evidence is stale and the person who made the alleged representation dead. We conclude that the disadvantage to Marvin if a fraud suit were brought now is sufficient to constitute detrimental reliance.

"It should also be noted that the mere signing of a division order which gives a right to the royalties has been held not to be enough to constitute estoppel. As stated in *Wagner v. Sunray Mid-Continent Oil Co.,* 182 Kan. 81, 318 P.2d 1039 (1957), the signing of a division order might estop the signer, vis-a-vis the oil

company, but would not estop them as against rival claimants to a mineral interest. The court stated:
" '[R]ather than reliance by the defendants to their detriment, plaintiffs' signing of the division orders in fact gave them a benefit to which they were not entitled.' 182 Kan. at 93.

. . . . .

"We conclude that Otto, in obtaining the quitclaim deed on behalf of Bert, Mathilda and himself, was ratified in his representation that they would not take Marvin's royalty interest. Such ratification occurred because of Bert's and Mathilda's apparent agreement with Otto when he came back and said to them, 'Let's let the poor sucker have some.' " 6 Kan. App. 2d at 409-410.

Thus it is clear that in order for estoppel to apply, the party asserting it must at least show: (1) misrepresentation; and (2) detrimental reliance.

For this principle to apply to the instant case, it must be found that either plaintiffs, or their predecessors in interest, made misrepresentations to defendants, or their predecessors in interest, upon which they relied to their detriment.

Defendants allege that M. F. Cosgrove's actions: (1) In signing the unitization agreement wherein J. L. Tice's interest was set out; (2) in the 1949 letter in which he mentions Tice's interest; and (3) in his dismissal of A. G. Stewart from a 1922 quiet title action, misled D. P. Young into purchasing the royalty contract rights. However, none of these acts were meant to mislead anyone. Mr. Cosgrove was obviously acting under the mistaken belief that Young's predecessors in interest had a valid right to receive royalty payments under the 1918 contract. There is nothing to show active misrepresentation or concealment. In fact, defendants' predecessor, D. P. Young, could have had the title examined before purchasing the contract rights to ascertain exactly what interest he would receive by this transaction. That he did not is the fault of neither plaintiffs nor their predecessor M. F. Cosgrove.

The second element, detrimental reliance, is also absent in the case. Defendants argue that they have received royalties since 1957 and have paid taxes on the same since 1956. However, *Fast v. Fast*, 209 Kan. 24, 496 P.2d 171 (1972), cited by the Court of Appeals in *Stratmann*, disposes of this matter. There, the court held that the defendants were not estopped to claim title to mineral interests because the grantor had continued to receive royalties and pay taxes on the interest. The court found no misrepresentation or detrimental reliance. 209 Kan. at 29.

As in *Fast,* at best, we have involved herein an acquiescence by M. F. Cosgrove, *et al.,* in a continuing course of conduct which was, if anything, beneficial to the Youngs and their predecessors in interest. In *Fast,* the court discussed the signing of division orders as working an estoppel by acquiescence:

"At best we have an acquiescence by C. F. in a continuing course of conduct which was, if anything, beneficial to Jake. In *Wagner v. Sunray Mid-Continent Oil Co.,* 182 Kan. 81, 318 P.2d 1039, we held that the signing of a division order might estop the signer vis-a-vis the oil company, but worked no estoppel as against rival claimants to the mineral interest, saying, 'rather than reliance by the defendants to their detriment, plaintiffs' signing of the division orders in fact gave them a benefit to which they were not entitled.' (*Id.,* at 93.)" 209 Kan. at 29.

Thus, the court in *Fast* found no elements of either a genuine or quasi-estoppel on the facts in that case. Here, the same could be said of the unitization agreement. M. F. Cosgrove's signing of that agreement gave defendants and their predecessors a benefit to which they were not entitled as opposed to inducing reliance by the defendants to their detriment.

Defendants have failed to show that estoppel should apply.

The next principle addressed by the *Stratmann* court was waiver. However, since it was not raised in this case, it will not be addressed.

Finally, the doctrine of laches was addressed in *Stratmann* at 411:

*"Laches*
"The doctine of laches is an equitable device designed to bar stale claims, and courts of equity will regard long passage of time in asserting claims with disfavor apart from any particular statute of limitations. *Clark v. Chipman,* 212 Kan. 259, Syl. ¶ 6, 510 P.2d 1257 (1973).

"In *Darby v. Keeran,* 211 Kan. 133, Syl. ¶ 10, 505 P.2d 710 (1973), we note:

" 'Delay, by itself, does not constitute laches and an action generally will not be defeated by laches alone unless some prejudice has resulted therefrom to the rights or interests of the adverse party.' "

The *Stratmann* court found that laches was applicable to bar the sister and brother of Marvin from claiming title to the royalty payments by virtue of the quitclaim deed executed over fifteen years before. Again, as in the case of estoppel, the person asserting laches must show prejudice. The court found that Marvin was prejudiced by the fact that if he had known earlier about the loss of his royalty rights, he could have alleged fraud.

Such is not the case here. Defendants have shown no prejudice

due to plaintiffs' actions in this matter as already set forth in the discussion of estoppel.

Further, this case differs from *Stratmann* in that there the defendants were the parties who knew of plaintiff's receipt of royalty payments and yet took no action to cut off his rights for over fifteen years. In the present case there is no evidence in the record that the plaintiffs had actual knowledge of the Youngs' receipt of royalty payments prior to October, 1978, when they received the proposed division order. They immediately asserted their rights to the entire royalty interest.

*Stratmann,* as in this case before us, was submitted on an agreed stipulation of facts and documentary evidence. The *Stratmann* court noted:

"All three theories (estoppel, waiver and laches), involve questions of fact. The case was submitted to the trial court on the depositions, probate files of the former owners of the land, file of the partition action, and certain affidavits and admissions of parties.

" 'When a case is submitted to the trial court on an agreed stipulation of facts and documentary evidence, this court is afforded the same opportunity to consider the evidence as the trial court. [Citation omitted.]' *Stith v. Williams,* 227 Kan. 32, Syl. ¶ 1, 605 P.2d 86 (1980)." p. 411.

The trial court appears to have based its holding on estoppel, laches, and acquiescence. We conclude that the trial court's application of these equitable principles was misplaced. The facts relied upon by defendants to support the invocation of said equitable principles are insufficient on the rationale previously set forth.

Finally, defendants argue they have acquired a mineral interest by adverse possession. Adverse possession applies only to real property. One cannot obtain a royalty interest by adverse possession. *Stratmann,* 6 Kan. App. 2d 403, Syl. ¶ 5. The defendants have never been in possession of a mineral interest herein. Hence, they at no time "adversely" possessed the property. This point is without merit.

In summary, we conclude the trial court did not err in determining: (1) The instrument in question conveyed only a royalty interest; (2) the instrument was in no way modified or mutated into a mineral interest; and (3) the instrument was null and void for violation of the rule against perpetuities. The trial court erred in failing to quiet plaintiffs' title to all mineral interests herein. This results in the affirmance of the issues raised

on the appeal and the reversal with directions as to the issues raised on the cross-appeal. The judgement is therefore affirmed in part, and reversed in part with directions on remand to enter judgment quieting plaintiffs' title to all mineral interests in accordance with the opinion herein.

HERD, J., dissenting: The majority opinion relies entirely on the rationale of *Lathrop v. Eyestone,* 170 Kan. 419, 227 P.2d 136 (1951), for the resolution of this controversy. I must respectfully take issue with the reasoning. The facts herein are clearly distinguishable from *Lathrop.* In *Lathrop* the two instruments determined to be royalty conveyances both purported to sell and convey a fractional interest in a certain existing oil and gas lease and to convey the same fractional interest in the oil and gas royalty from future leases. The conveyances were conditioned upon such future leases. For emphasis I repeat the court's statement in *Lathrop:*

"We need not determine whether these instruments, or any of them, were intended to be binding on subsequent fee title owners. If such was the intention when would the grant of such future interests vest? Appellant or future fee owners might never execute another lease. There is nothing in any of the instruments which imposes a duty on them to do so. Under the last two instruments, at least, the fee title owner would not be precluded from doing his own developing. [Citations omitted.] Moreover there is no limitation of time within which a future lease would be required to be executed, if one were actually executed. It is, therefore, wholly problematical when, if ever, such an interest under future leases would vest. Such a grant violates the rule against perpetuities, a rule against too remote vesting." 170 Kan. at 428.

Let us now turn to the wording of the instrument out of which this controversy arose:

"[D]o by these presents sell, assign and agree to deliver unto said party of the second part, his heirs and assigns, one-half (½) of the royalty in Oil and Gas produced upon the following described land, to-wit:

The East Half of Section twenty-two (22), in Township thirty-three (33), Range thirty-four (34), in Seward County, Kansas, containing 320 acres, more or less, according to the Government survey thereof;

and that this contract conveys to the second party, said royalty, whether paid in cash by the company now holding the oil and gas lease on said premises, as provided in such lease, or of any royalties to become due and owing by reason of any future oil or gas leases executed and delivered by the said first parties or their assigns; and that this contract further binds said first parties, their heirs or assigns, to deliver to the second party one-half of all royalties to become due and owing to said first parties, their heirs or assigns by reason of any production of oil or gas produced upon said premises.

"The said first parties hereby bind themselves, their heirs and assigns, unto said second party, to promptly deliver to said second party his one-half of said royalties immediately upon receipt of said royalty by the said first parties, in the event said royalties are paid to said first parties, and the present lessee, and the lessees of any future leases upon said premises are hereby authorized and directed to pay direct to said second party, his one-half of any and all royalties becoming due first parties by virtue of any oil or gas lease."

In my opinion, the instant instrument is clearly distinguishable from those in *Lathrop v. Eyestone.* It does not make the conveyance dependent upon leases, present or future. It merely instructs the lessees to pay royalty to Stewart and his heirs. It provides that the Akers are selling one-half (½) their royalty under the half section to Stewart *now.* There is no delay. The conveyance is not contingent upon leasing as a condition precedent. It is the sale of a present interest and vests immediately. The rule against perpetuities applies only to future interests.

*Lathrop v. Eyestone* was written to apply narrowly to sales of a future interest dependent upon a condition precedent to vesting. The majority opinion extends the rule against perpetuities to *all* sales of oil and gas royalty in Kansas which extend beyond twenty-one years regardless of the wording of the instrument of conveyance. Until now this court has been unwilling to take such a step; for example, in *Froelich v. United Royalty Co.,* 178 Kan. 503, 290 P.2d 93 (1955), *modified on reh.,* 179 Kan. 652, 297 P.2d 1106 (1956), decided subsequent to *Lathrop,* we held a conveyance comparable to the one we are concerned with to be exempt from the rule against perpetuities because "the interest vested immediately." 178 Kan. at 509.

Our ruling in *Lathrop* is peculiar to Kansas. The case has been the subject of numerous commentaries by oil and gas authorities. 3 A Summers, Oil and Gas § 576, pp. 31-32, notes our subsequent inconsistent holdings:

"From this decision it may seem that a perpetual nonparticipating royalty interest cannot be validly created in Kansas. There are other decisions, however, which indicate the contrary. In *Miller v. Sooy,* [120 Kan. 81, 242 Pac. 140 (1926)] where a deed conveyed royalties under future leases to be executed by the grantor, the royalty was valid. In *Hickey v. Dirks,* [156 Kan. 326, 133 P.2d 107 (1943)] a royalty interest was held to survive an existing lease and continue for the producing life of the property. In *Davis v. Hurst,* where a grant of land reserved one-half of the oil and gas royalties to the grantor and the grantee later leased the land for oil and gas, the grantor was not entitled to share in the delay rental and cash bonus paid under this lease but was entitled to one-half of the oil and gas royalties reserved therein."

1 Kuntz, Oil & Gas § 17.3, pp. 392-93, contains a brief comparison of the rule in *Lathrop v. Eyestone* to other states' handling of the problem:

"In Kansas, an assignment of a right to receive royalties is treated as a valid covenant to pay royalties which are payable to a lessor by a lessee under a lease. If the assignment relates to royalties payable under a present lease, or if the instrument is construed to relate only to leases executed by the grantor of the royalty interest, the grant of such an interest is valid. If, however, the grant purports to be perpetual in duration and relates to all leases granted in the future, it is invalid as a violation of the rule against perpetuities. Such position was presented to the court in Arkansas and was repudiated. In Arkansas, the court examined the question thoroughly and concluded that the non-participating royalty interest is a vested interest in real property and does not violate the rule against perpetuities. In other jurisdictions with decisions on the subject, with the possible exception of Colorado, the non-participating royalty interest is recognized as a vested interest in the minerals, and undoubtedly such interest does not violate the rule against perpetuities unless vesting is postponed beyond the perpetuity period by the terms of the grant."

Later cases reaching the same result as the Arkansas court in *Hanson v. Ware,* 224 Ark. 430, 274 S.W.2d 359 (1955), include *Price v. Atlantic Refining Company,* 79 N.M. 629, 447 P.2d 509 (1968), and *McGinnis v. McGinnis,* 391 P.2d 927 (Wyo. 1964).

By far the most intensive analysis of *Lathrop v. Eyestone,* and issues involved therein is contained in 2 Williams & Meyers, *Oil & Gas Law* § 323, pp. 13-15. After stating *Lathrop* is not "distinguished by clarity in either the statement of the case or the explanation of the result" the after-effects of that decision are examined:

"In short, the case holds that perpetual non-participating royalty and non-executive mineral interests cannot be created in Kansas. An instrument purporting to create an interest in future bonus, rental or royalty, unlimited in time, is virtually worthless in that state under this decision. . . . It seems that Kansas will permit a thereafter clause to be inserted in the deed to preserve the interest after the expiration of the period in gross, but such a clause operates only if there is production. Thus a grant of a one-sixteenth royalty for fifteen years and so long thereafter as oil and gas is produced creates a valid interest, terminable in fifteen years if there is no production on the land at that time, or if there is, when production ceases. While some persons are willing to take such interests, the risks involved will impel many persons to demand a fully participating fraction of the mineral estate, with the result that large areas of mineral land in Kansas are likely to be held by tenancy in common. . . . [I]t is doubtful that the policy of the Rule against Perpetuities is served by encouraging the division of minerals into small shares held in common."

The inconsistency of the *Lathrop* rule with the treatment afforded similar interests is noted in 2 Williams & Meyers, Oil & Gas Law § 324.4, pp. 59-60:

"The grant or reservation of a perpetual non-participating royalty creates a right-duty with respect to oil or gas produced at any time from the land, whether by a lessee or by the executive. That production is uncertain and may never occur should not defeat the interest. The royalty created by a long-term oil and gas lease has never been thought to offend the Rule against Perpetuities, though subject to precisely the same contingency; namely, the discovery and production of oil or gas. The reservation as rent of a share of crops in a long-term lease for years has never been held to violate the Rule, although the growing and harvesting of the crops is subject to uncertainty. . . . To hold perpetual royalty to be too remote is to confuse the value of the right with the right itself. From the time the executive delivers or accepts the deed, he is bound to account to the non-executive for a fraction of the oil; the duty may not be onerous for there may never be any oil; but the lack of production does not remove the duty."

Finally, Williams & Meyers point out the contradictions in the Kansas court's application of the rule against perpetuities at § 323, pp. 15-16:

"It is an odd fact that in Kansas the perpetuities attack has succeeded only with respect to royalty and non-executive mineral interests. In *Kenoyer v. Magnolia Petroleum Co.* [173 Kan. 183, 245 P.2d 176 (1952)] a 640-acre gas pooling clause, in typical form, was held not to violate the Rule against Perpetuities. *Lathrop v. Eyestone* was not cited. In *Howell v. Cooperative Refinery Association* [176 Kan. 572, 271 P.2d 271 (1954)] a reservation of an overriding royalty in an assignment of an oil and gas lease was expressly made applicable to any extension or renewal of the lease. The court rejected the argument that provision for payment of overriding royalties out of lease extensions or renewals violated the Rule against Perpetuities. Again *Lathrop v. Eyestone* was not cited. Of course, factual distinctions exist between *Lathrop* and the two subsequent cases. Nonetheless, the refusal to apply the Rule to situations where it could, conceptually, have been applied raises a doubt regarding the continued authority of the *Lathrop* decision."

Although these cases, along with *Froelich v. United Royalty Company,* call into question the continued authority of *Lathrop,* until it is reversed sales of royalty will remain questionable in Kansas.

The rule against perpetuities is, of course, a restraint on the right to create future interests. It is aimed at the unreasonable continuance of indirect restraints on alienation. (See 70 C.J.S., Perpetuities § 2, at p. 574.) In my opinion a conveyance of future royalties does not violate the spirit of the rule. An excerpt from the Arkansas case of *Hanson v. Ware,* 224 Ark. 430, approves the reasoning behind this position:

"It has been demonstrated in some detail that the policy underlying the rule against perpetuities presents no obstacle to the creation of a nonparticipating royalty, for the device actually tends to promote rather than to inhibit the leasing of the minerals. Meyers, The Effect of the Rule Against Perpetuities on Perpetual Non-Participating Royalty and Kindred Interests, 32 Tex. L. Rev. 369.

"We are decidedly of the opinion that the rule against perpetuities was not violated by the conveyance to these appellees, for the reason that they acquired a present interest rather than a future interest in the land. To treat the appellees' royalty as a future interest involves a failure to distinguish between their estate in real property, which is an abstract legal conception, and the likelihood of their ultimately receiving a share in the production of oil and gas, which is purely a practical matter.

". . . The appellees' estate was doubtless speculative in value, but the uncertainty stemmed from a fundamentally different reason from that which makes an ordinary contingent remainder an estate of doubtful worth. In the latter case the physical property is known to exist; the uncertainty is whether the contingent remainderman or some third person will eventually acquire the absolute ownership. Here, however, no third person is involved. The appellees' title being complete, the doubt is occasioned not by the possibility that someone else may acquire the property but by the possibility that there may in fact be no oil and gas within the land. *In short, the typical contingent remainderman has an uncertain interest in the fee simple, while these appellees have a fee simple interest in the uncertain.*" (Emphasis added.) 224 Ark. at 435-36.

The trial court should be reversed and judgment entered for the defendants. The Akers and Stewart entered into a contract in 1918 for valuable consideration. Their successors have treated the contract as binding for a period of 64 years. The subsequent purchaser, Young, relied on the contract and purchased the interest. In light of the inconsistencies of this court's rulings, the distinguishability of *Lathrop* from the facts herein, and the history of the contract, he was justified in relying on the contract.

In theory, I would reverse *Lathrop v. Eyestone* and make Kansas law conform to the better rule of *Hanson v. Ware.* But we need not go that far to reverse the trial court. This can be accomplished without strain by distinguishing *Lathrop* and using *Froelich* as authority.